The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Dillard. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
1. At the time of the alleged injury by accident giving rise hereto, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act, the defendant-employer regularly employing three or more employees, one of whom was the plaintiff.
2. At all times pertinent hereto, there was an employee-employer relationship between the parties and the defendant.
3. Transportation Insurance Company was the carrier on the risk at said time.
4. The parties stipulated to a Form 22 prepared by the defendants from which the Industrial Commission calculated the plaintiff's average weekly wage as $414.40 yielding a compensation rate of $276.28.
5. The parties stipulated that the plaintiff sustained an injury by accident on February 11, 1991, arising out of and in the course and scope of his employment and that even though no agreement for compensation for disability was entered by the parties the defendants paid plaintiff compensation for the period from March 8, 1991 through April 4, 1993, and May 8, 1993 through May 23, 1993.
6. The parties stipulated into the evidentiary record a package of medical records containing 291 pages.
* * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACT
1. The plaintiff began work for defendant on March 5, 1989. He was a maintenance worker and his job consisted of mechanical work using various types of tools, welding, cutting, doing hydraulic work, as well as electrical work and otherwise general maintenance. Plaintiff's job also included lifting, bending, stooping and carrying. The work was a heavy type work in an industrial plant where the temperatures were often hot. The plaintiff worked a midnight shift from 12:00 midnight until 8:00 a.m.
2. On February 11, 1991 shortly after the plaintiff began his work shift he was called to unstop a grinder. Often times in the past the plaintiff would switch electrical wires in the switch box to make the grinder run in reverse to aid in unstopping it. On this particular occasion the plaintiff was assisted by his co-worker, Robin Edwards. After the plaintiff was unable to turn the rotary on the grinder to get the plastic that was stuck in the grinder loose, he made the decision to rewire the grinder and send it in reverse as he had done in the past. The plaintiff climbed upon a three to three and a half foot stool to reach the electrical box in order to rewire the grinder. While the plaintiff was attempting to loosen the bolt on the wire he forgot that the switch on the machine had not been pulled thus turning off the electrical current. The plaintiff placed his hand on the electrical box to stabilize himself while he was performing this task and in so doing he received an electrical shock which consisted of 440 volts. When the plaintiff received this electrical shock he was shaken by the shock and the stool upon which he was standing fell out from under him and the plaintiff then fell to the floor. He landed on his feet and as he was falling to the floor his co-employee, Robin Edwards, helped stabilize him and prevented him from falling all the way to the floor. The plaintiff was dazed for a matter of minutes and was unable to perform any other work during his shift. The plaintiff noted that his heart was beating rapidly and he was scared. The plaintiff remained at work during the rest of his shift but was unable to perform his work duties.
3. When the plaintiff went home after his work shift he was unable to sleep and he had pain in his shoulder, neck and head. Plaintiff contacted Sidney Beard, the head of maintenance, but was told to come onto work. He was told that a co-worker would help him perform his job duties. Mr. Beard testified that it was the company policy to encourage injured employees to come into work. The plaintiff did get over some of his soreness, but by March 5th or 6th was unable to work and he requested Mr. Beard to make him a doctor's appointment. No appointment was made and so the plaintiff asked a second time for a doctor's appointment and the appointment was scheduled with the company doctor, Frank Fondren, on March 8, 1991. Dr. Fondren took x-rays of the plaintiff and prescribed medicine for his headache. Plaintiff was to return to Dr. Fondren on March 11, 1991. However, defendants laid plaintiff off of work as of March 8, 1991 and he has not returned to work with the defendants or any other employer since that date. After defendant-employer laid plaintiff off and after the defendants' company doctor had referred the plaintiff to Dr. Martinez, the defendants instead sent the plaintiff to Dr. Gregory Bertics for treatment. The plaintiff thereafter treated with Dr. Bertics through the time of the hearing. Dr. Bertics referred the plaintiff to Dr. Robert Wyker, who diagnosed the plaintiff with a possible rotator cuff tear which Dr. Wyker causally related to the plaintiff's February 11, 1991 injury by accident. Surgery to repair the torn rotator cuff was performed May of 1991.
4. The plaintiff was next referred to Dr. Wilson S. Comer, Jr., who diagnosed the plaintiff with major depression and chronic pain as a result of his on-the-job accident at W. R. Grace Company and also with post traumatic stress disorder. As of August 25, 1992 Dr. Bertics, who had continued treating the plaintiff diagnosed him with a fibrosistis or traumatic fibromylalgia with muscle pain in neck. The plaintiff saw many other doctors and had many tests performed, but the two primary treating physicians, Dr. Bertics and Dr. Comer, both doctors being doctors that plaintiff saw by referral from his employer or employer-doctor, have diagnosed the plaintiff as disabled from work at this time and unable to do any type of work at this time. Dr. Bertics is further of the opinion that the plaintiff will not be able to return to the job that he held with W. R. Grace and he has placed restrictions upon him as to his lifting capacity and the types of maneuvers that he should make in a job. The evidence does not establish that the plaintiff will never be able to work, but it does indicate that the plaintiff has not reached his maximum medical improvement as a result of his depression and pain which is related to his injury by accident and it does establish by its greater weight that the plaintiff requires continuing medical treatment because there is a significant likelihood that plaintiff will continue to suffer from his depression and pain including headaches and until such time as the plaintiff is able to obtain relief from his pain and assistance with his depression he will continue to require medical attention designed to give relief or effect a cure or to lessen the anticipated period of disability.
5. The evidence established that the plaintiff was an avid fisherman and hunter and that prior to his February 11, 1991 injury by accident he hunted or fished nearly every day. The defendants have argued and contend that the plaintiff has continued to hunt and fish and that his ability to hunt and fish either signifies that he is capable of work or signifies that his alleged failure to inform his treating physicians that he was hunting and fishing should cause his credibility to be questioned with respect to the severity of his headaches and neck pain and the disabling effect of his depression.
6. The defendants called as witnesses two wildlife enforcement officers who corroborated the plaintiff's testimony that he was an avid hunterman and fisherman and that he was regularly seen in the hunting grounds and on fishing waters located in the area where he lives. The plaintiff, however, testified that in the year of 1993 he hunted no more than five times during the morning hours and that in the evenings during the hunting season he might hunt three times a week for a period of one to two hours, but that the type of hunting that he did was primarily deer hunting where he would only walk to a stand and sit in the stand. His hunting did not involve strenuous activity and he testified that he would seldom fire a shot when he went hunting. Plaintiff testified that he hunted about the same number of times in 1992 as he did in 1993. His hunting time was obviously decreased from his pre-injury days. With respect to the plaintiff's fishing, defendants attempted to show that the plaintiff was acting as a guide, but the evidence failed to establish that the plaintiff had ever purchased a guide license or was ever involved in guiding. The plaintiff testified that he had greatly reduced the number of times that he fished and that in the year prior to the hearing he did not think he had fished more than eighteen times. Even the wildlife officers indicated that they primarily saw plaintiff fishing between April and May or a two-month period and that during this period of time some of his fishing would be herring fishing which involves just sitting in the boat for periods of a half to three-quarters of an hour running a gill net, an activity that would be primarily restful rather than strenuous type work. Plaintiff testified that there were even times when he went fishing that he would feel so bad that he would have to leave and go home or would sometimes lie down in his boat. This was corroborated by one of the wildlife officers who testified that on two different occasions he saw the plaintiff lying in his boat with a shirt folded under his head because he was having a headache. On one occasion the plaintiff terminated his fishing activity because he was feeling so bad and actually offered to give his live bait to the wildlife officer who was fishing with his children. The wildlife officers corroborated that the plaintiff was an avid and well known hunter and fisherman in the area but they likewise corroborated the plaintiff's testimony when he said that he had pain and was often disabled even from fishing.
7. The medical testimony establishes that the plaintiff, as of the time of the hearing, was disabled from work. The plaintiff, himself, contends that as of the time of the hearing he is disabled from work. The burden is therefore upon defendants to show that the plaintiff, contrary to his testimony and contrary to the medical evidence, is able to work and that there is employment which the plaintiff can obtain. No such evidence was even offered by the defendants. Instead the defendants tried to attack the plaintiff's credibility and tried to establish that merely because the plaintiff was able to get out of his house and go fishing or walk through the woods to a hunting stand that he was able to work. The defendants have not offered the plaintiff any work and they have not established that there is any work available for him, let alone establishing what types of work he can now perform in light of his 25% disability to his left upper extremity, his major depression and chronic pain in his neck and head and his limited education and reading and writing skills.
8. The plaintiff employed Stephen D. Carpenter, a vocational evaluator, who performed a vocational assessment and concluded that the plaintiff was not employable at the present time based on limitations which significantly impact his vocational function and even unskilled sedentary work. Mr. Carpenter noted that the plaintiff's grade equivalency was that of fifth grade spelling, fifth grade in reading and eight grade in arthritic. Defendants did not attack this evidence, but merely argued that the opinion of Stephen D. Carpenter should be discounted and even rejected since he was hired to testify by the plaintiff.
9. The overall circumstances in this case are egregious as to the treatment that has been given to the plaintiff. First, the plaintiff received an electrical shock of more than 400 volts of electricity while he was standing on a stool, the stool was knocked out from under him and he remained hanging while being shocked and shaken until his body weight pulled him loose from the machine he was repairing and the electric circuit box that he was touching. The plaintiff fell to the floor, but was caught by his co-worker who confirmed what took place. There was no question as to whether or not the plaintiff had in fact had an injury by accident, there was an eye witness, the injury was reported to the superiors within all required time limits. The Form 19 even indicates that the plaintiff's supervisor knew of the incident on the same day that it occurred. However, after the plaintiff the next day reported feeling as though he could not come to work he was told to come to work anyway and as it became apparent in the next several days that he was less able to perform his job and that he obviously had some type of injury and after he had asked on two occasions for permission to obtain medical treatment his employment with the defendants was terminated. The defendant-employer was conscious about its safety record and awarded people that had time without accidents but also published memos on the bulletin board about individuals who had been hurt on the job. While plaintiff was hurt and while he felt he was unable to work he was required to continue working. Plaintiff's employment was terminated on March 8, 1991. Defendants contend that this is the same day that plaintiff first saw his doctor and that he probably only saw the doctor in retaliation for having been laid off; however, after the plaintiff saw the doctor and was taken out of work his claim was denied on April 19, 1991. The Form 19 was filed March 13th or was dated March 13, 1991 five days after the plaintiff's lay off from work and five days after he had seen the doctor and the Form 19 indicated that the plaintiff would have no period of disability. The defendants, however, did provide medical compensation for the plaintiff although they refused to acknowledge his injury by accident by entering into an agreement for compensation. Next, even after the doctors to whom defendants referred the plaintiff reported that he was disabled from work and rated him with disability and even a permanent disability with respect to his rotator cuff tear, the defendants did not enter into an agreement for compensation with the plaintiff nor submit such agreement to the North Carolina Industrial Commission for approval. The defendants did, however, voluntarily make payments to the plaintiff, but the evidence does not establish that these payments were payments from a company funded disability plan, but instead would appear to have been voluntary payments of what should have been workers' compensation benefits; however, these benefits were then terminated by the defendants even though they sought approval from the Industrial Commission to terminate the benefits and the Industrial Commission initially denied approval for terminating the benefits before it was known that there was not an agreement for compensation. Of course without an agreement for compensation the defendants can unilaterally terminate the benefits and so the mere termination of the benefits in and of itself violates no rule or regulation of the Industrial Commission nor aspect of the compensation law, but coupled with the termination of the plaintiff from employment once it was apparent that he had an injury, the denial of his workers' compensation claim by the carrier even after he had become disabled and taken out of work by his treating physicians just a few weeks prior to his rotator cuff surgery and also coupled with the fact that defendant made no attempts to compensate the plaintiff for his permanent disability nor to offer him replacement work is evidence that must be considered in the overall scheme of the case.
10. The plaintiff suffers with a constant dull ache in the back of his head which waxes and wanes in severity and often increases to include the entire scalp area. When his headaches are the worst he has to take extra medication, has to apply something around his head as pressure to his temples and it often takes hours for this to subside. The plaintiff may be able to perform some type of work during the periods of time that he is not suffering from these severe headaches, but the evidence in this case has not established that fact.
11. The plaintiff received a crush injury to his head while in the employment of the defendants in May of 1989. He suffered a mild concussion and his head was swollen and he had blurred vision for awhile. Thereafter, he had headaches. However, medical records establish that he had recovered from this injury and there is no indication that the plaintiff's headaches now are related to his previous injury. It should also be noted that the plaintiff has bilateral carpal tunnel syndrome and has had carpal tunnel release surgery on both hands.
12. The plaintiff needs to be enrolled in a pain management program and needs continuing psychiatric care.
13. The plaintiff has not been able to chose a physician of his own, but it appears to the undersigned that plaintiff has received necessary and appropriate medical treatment from his treating physicians. He should continue in their care, although pursuant to the North Carolina Workers' Compensation Act he does have the right to chose a physician to continue his medical care.
* * * * * * * * * * *
Based upon the findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. On February 11, 1991 the plaintiff sustained an injury by accident which arose out of and in the course and scope of his employment with defendant-employer on February 11, 1991. The plaintiff's injury was that of an electrical shock which resulted in a torn rotator cuff and further resulted in chronic pain in his neck and head as well as major depression and a post traumatic stress disorder. The plaintiff's injury by accident was an unlooked for and untoward and an unforeseen occurrence. As a result of the plaintiff's injury by accident he has been disabled from work since March 8, 1991 and he continues to be disabled from work at this time.
2. The defendants have paid some compensation to the plaintiff; however, defendants are not entitled to a credit for the compensation paid to the plaintiff because they refused to admit liability in his case and referred to enter into an agreement of compensation.
3. The plaintiff is in need of continuing medical compensation and is entitled to such medical treatment as tends to give relief, effect a cure or to lessen his period of his disability. There is a substantial risk of the necessity of the future medical compensation at this time due to the plaintiff's not having reached his maximum medical improvement and due to his continuing major depression and chronic pain.
4. Plaintiff's average weekly wage was $414.40 which yields a compensation rate of $276.28.
* * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
AWARD
1. Subject to counsel fee hereinafter allowed, the defendants shall pay to plaintiff compensation benefits at the rate of $276.28 per week beginning March 8, 1991 and continuing until the plaintiff returns to gainful employment or until further orders of the Industrial Commission. As much of said compensation as has accrued shall be paid in a lump sum without commutation. There are no credits or deductions to be applied to the accrued benefits.
2. Defendants shall pay all medical expenses incurred by the plaintiff as a result of the injury by accident giving rise hereto when bills for the same have been submitted through the defendant-carrier to the Industrial Commission and approved by the Commission. The defendants shall continue to provide medical compensation to the plaintiff in the future so long as such medical treatment would tend to give relief, effect a cure or lessen plaintiff's period of disability. The defendants should consider providing to the plaintiff a work hardening and pain management program which would tend to prepare him for re-entry into the job market. The plaintiff would also be a candidate for vocational rehabilitation once his treating physicians are of the opinion that physically and psychologically he is able to re-enter the workforce. The defendants should be cognizant of the fact that merely establishing a regiment for the plaintiff to file job applications and seek employment from spot to spot within his community is not the type of vocational rehabilitation referenced in this Opinion and Award but instead would be a program of activities that would school and train the plaintiff for some type of gainful employment and then offer him trial returns to work allowing him to re-enter the workforce upon a schedule approved by his treating physicians, if in fact they should ever decide to approve such activity. Plaintiff has noted his desire to return to work and at the same time expressed his well founded fears of not knowing whether he can return nor when he can return. Hunting and fishing alone may be some indication of his desire to be out and about and some indication of his physical abilities or even the lack of physical disabilities, but it is not alone an indication of his employability following his injury by accident, his major depression and his pre-existing educational limitations.
3. A reasonable attorney fee in the amount of 25% of the compensation awarded to the plaintiff herein is approved and allowed for plaintiff's counsel. Said amount shall be deducted from the compensation payable to the plaintiff and shall be paid directly to his attorney. As to the accrued compensation payable, the 25% of said compensation shall be paid directly to plaintiff's attorney. As to compensation payable in the future, every fourth check of compensation shall be paid to plaintiff's attorney.
4. The defendants shall pay the costs.
 S/ ________________________ COY M. VANCE COMMISSIONER
CONCURRING:
S/ ________________________ BERNADINE S. BALLANCE COMMISSIONER
S/ ________________________ THOMAS J. BOLCH COMMISSIONER
CMV/CNP/tmd 5/8/95